WILLIAM CHOWNING *v.* STATE OF INDIANA.

[No. 1-972A72.  Filed June 19, 1973.]

*Gene E. Hutson,* of Richmond, for appellant.

*Theodore L. Sendak,* Attorney General, *Anthony J. Metz, III,* Deputy Attorney General, for appellee.

HOFFMAN, C.J.—Appellant William Chowning was charged by affidavit with the crime of second degree burglary of the

L & L Drive-Inn in Richmond, Indiana. Trial was to a jury which found Chowning guilty of the crime of second degree burglary as charged in the affidavit. Chowning was sentenced to be committed to the Indiana Department of Corrections for not less than two years nor more than five years and disfranchised and rendered incapable of holding any office of trust or profit for a period of four years. The timely motion to correct errors filed by Chowning was overruled and this appeal followed.

On appeal, Chowning first contends that "[t]he waiver of constitutional rights and the statement taken from defendant [Chowning] while under the influence of drugs was not voluntary and should have been suppressed."

The record before us shows that Chowning was arrested on February 11, 1972. Chowning testified that he had "smoked some marijuana that morning" and that he "had taken mescaline and speed." Chowning was taken by the police to the City Building for questioning. He signed a written "warning and waiver [of] rights," but refused to answer any questions. Chowning was then placed in solitary confinement at the Safety Building.

In the hearing on the motion to suppress, Chowning testified that after breakfast on the morning after he was arrested he took some mescaline which had been hidden in his shoe. Chowning further testified:

"I was under sort of an agony—when your system is introduced to speed and mescaline you get a tendency to talk to somebody and have people around, and I was under tension cause I was in solitary confinement and I needed somebody to talk to I guess."

Later that morning, February 12, 1972, Chowning was questioned by the police but answered no questions.

During the afternoon of February 12, 1972, Chowning was taken to the City Building where he talked with the police. Chowning testified that he had no problems in observation or talking but felt a compulsion to talk. At that time Chowning

signed a written "waiver" and "voluntary statement" admitting breaking into the L & L Restaurant, however, such statement was not admitted into evidence at the trial.

On February 13, 1972, Chowning was taken to the City Building at which time he again signed a written "warning and waiver [of] rights" and "voluntary statement." The pretrial motion of Chowning to suppress all statements given by the defendant was overruled by the trial court and the following portion of the February 13, 1972, statement was admitted into evidence at the trial:

"Q. Bill, we found a jar of change, some meat and two coats in the apt. of Donna Chaneys. Where did these come from. The jar had $25.24 in asst. [assorted] change in it?

"A. From the L & L, there was about $10.00 from there. The meat and coats came from the L & L. There was also about 10-12 packs of cigarettes in a bedroom vanity that came from the L & L.

"Q. Bill, did you hid [hide] all the stuff in the apt. of Donnas, [Donna's], the meat, coat, cigarettes and money?

"A. No.

"Q. Bill, who hid it?

"A. I don't know who hid it the only thing that I was worried about was hiding the money.

"Q. Bill, where did the rest of the money go to that was taken from the L & L?

"A. Ron and I split the money and the last I knew he had hid his part in a dresser in the girls [girl's] bedroom, I doubt if it is still there now.

"Q. Bill, is there anything else that you care to add?

"A. No.

"Q. Bill, before you gave this statement today you were again advised of your rights, and do you understand them?

"A. Yes, and I signed the waiver form."

Chowning testified that on February 13, 1972, he "was still a bit dizzy from the speed." He also testified that he took mescaline through the nostrils which would cause "probably some unordinary sniffing."

Detective Sergeant Donald Kolentus testified that on the morning Chowning was arrested Chowning walked and talked normally. Detective Sergeant Kolentus testified that on February 12, Chowning appeared to be normal, he did not "sniffle." Detective Sergeant Kolentus testified that on February 13, 1972, Chowning appeared to be normal, walked normally and talked clearly; his attitude was very good and he answered the questions he was asked but did not ramble.

Detective Sergeant Kolentus also testified as follows:

"I had received word Mr. Chowning wanted to see me on the 13th. The first thing I asked him was the fact he gave Detective Irvine and me a statement on the 12th and understood he had something else he wanted to say, which he did."

Sergeant Richard Irvine testified that on February 11, 1972, Chowning looked normal, his reactions were normal, but his attitude was very poor. Sergeant Irvine also testified that on February 12, he and Detective Sergeant Kolentus talked to Chowning who "admitted he made a mistake and wanted to give a statement and cooperate."

Police Officer Steven Stanford testified that he was present when the February 12, 1972, statement was taken. He testified that Chowning looked normal, that his reactions were normal, that he was not overly talkative, and that he did not appear to have a cold.

In *Gibson* v. *State* (1971), 257 Ind. 23, 271 N.E.2d 706, at 709, it was stated:

"A heavy burden rests upon the State to demonstrate that the appellant knowingly, voluntarily and intelligently waived his right to remain silent and to consult with appointed counsel." (Citing authorities.)

In *Nacoff* v. *State* (1971), 256 Ind. 97, 267 N.E.2d 165, at 167, it was stated:

"The legal standard to be applied in determining whether an accused, who has been properly advised of his rights and has signed a waiver, has voluntarily waived his rights is the same as that used in the pre-*Miranda* coerced con-

fession cases. The question is whether, looking at all the circumstances, the confession was free and voluntary, and not induced by any violence, threats, promises, or other improper influence."

In *Townsend* v. *Sain* (1963), 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770, the defendant, who was suffering from drug withdrawal symptoms, was administered hyoscine and phenobarbital by a police physician prior to confessing to the crime in question. At 307-308 of 372 U.S., at 754 of 83 S. Ct., it is stated:

"Numerous decisions of this Court have established the standards governing the admissibility of confessions into evidence. If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement. It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a 'truth serum.' It is not significant that the drug may have been administered and the questions asked by persons unfamiliar with hyoscine's properties as a 'truth serum,' if these properties exist. Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible." (Footnotes omitted.)

Under the particular evidence presented in the instant case, the question of whether the confession was drug-induced is preceded by the factual question of whether the defendant was under the influence of drugs at all at the time of the February 13, 1972, statement. The testimony of Chowning that he took mescaline, which had been hidden in his shoe on the morning of February 12, 1972, and was still under its effects on the morning of February 13, is controverted by the other evidence and from the uncontroverted fact that 24 hours had passed from the alleged taking of the "shoe-hidden" mescaline until the time the statement was given. We will not disturb the

judgment of the trial court. See: *Smith* v. *State* (1969), 252 Ind. 425, 249 N.E.2d 493.

Even, however, were we to presume that Chowning's confession was inadmissible, the conviction of Chowning would be affirmed. Ronald Gene Watts, an accomplice of Chowning, testified, on direct examination, as follows:

"Q. Who was present at that conversation?
"A. Just me and Chowning.
"Q. And approximately what time was this?
"A. It was around—about two-thirty.
"Q. And is that A.M. or P.M.?
"A. A.M.
"Q. Now what was said?
"A. He said—he come, woke me up and said 'do you want to get twenty dollars', and I said, 'what for?' and he said, 'I'll tell you later', and he walked out the door.
* * *
"Q. What did you [do]? Where did you go after walking out the door?
* * *
"A. From Steele's went to L & L Restaurant.
"Q. Did you arrive at the L & L Restaurant?
"A. Arrived, yeah.
"Q. And what did you do, if anything, upon arriving at L & L Restaurant?
"A. Well, Chowning began to break in the back door.
"Q. How did he break in the back door?
"A. With a crowbar.
* * *
"Q. What happened after the forcing of the crowbar in the door?
"A. We went inside, and he bagan [began] to break open juke boxes.
* * *
"Q. What happened after the juke boxes were opened?
"A. Well, he tried to open the cigarette machine which he couldn't get the coin part.
* * *
"Q. Was anything removed from the cigarette machine?
"A. Cigarettes.
* * *
"Q. O.K. What was done after the items were placed or the cigarettes were placed in the bag?

445

"A. I went back and started looking around and Chowning, he went to the refrigerator and he pulled out two hams—I think bacon too, and then he—."

The law of Indiana is well-settled that a conviction may rest upon the uncorroborated testimony of an accomplice. *Millington* v. *State* (1972), 154 Ind. App. 42, 289 N.E.2d 161, and cases there cited. Thus any error in the admission of the extra-judicial statement was harmless beyond a reasonable doubt. See: *Hightower* v. *State* (1973), 260 Ind. 481, 296 N.E.2d 654.

Chowning contends that "[t]he Court erred in overruling defendants [defendant's] motion for directed verdict and the verdict of the jury was contrary to law and not sustained by the evidence where no acts of the defendant were shown except by the uncorroborated testimony of an accomplice that was contrary to the corpus delicti proven by the prosecution that one man was present at the alleged burglary."

In *State* v. *Sullivan* (1960), 240 Ind. 274, at 278-279, 163 N.E.2d 745, at 747-748, it is stated:

"The correct rule as to proof of the corpus delicti is stated in 8 West's Ind. Law Ency., 'Criminal Law,' § 266, as follows:

'The corpus delicti, like any other fact necessary to sustain a conviction, must be established beyond a reasonable doubt. Generally, the term "corpus delicti" means, when applied to any particular offense, that the specific crime charged has actually been committed by some one.' Citing: *Taylor* v. *State of Indiana* (1957), 236 Ind. 415, 140 N.E.2d 104; *Hunt* v. *State* (1956), 235 Ind. 276, 133 N.E.2d 48.

"The above stated rule as to proof of corpus delicti should not of course be confused with the rule applicable to the admissibility of confessions, and which governs the degree of corroboration required by independent evidence necessary to make a confession admissible."

Here, there is more than sufficient evidence from which it could be found beyond a reasonable doubt that the crime charged had actually been committed by someone. While one

of the police officers testified that he saw only one set of footprints in the snow at the L & L Restaurant, the State presented sufficient evidence from which it could be inferred that Chowning was guilty beyond a reasonable doubt of each element of the offense charged.

Judgment affirmed.

Sharp and Staton, JJ., concur.

NOTE.—Reported at 297 N.E.2d 487.